684 F.2d 599
 RESEARCH MEDICAL CENTER, a non-profit corporation, Appellant,
v.
Richard S. SCHWEIKER, Secretary of Health and Human
Services; Blue Cross Association, an Illinois
non-profit corporation and Blue Cross of
Kansas City, a Missouri
non-profit
corporation,
Appellees.
 No. 81-2364.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 20, 1982.
Decided Aug. 9, 1982.
 
 J. D. Epstein, Roger L. Levy, Wood, Houston, Tex., Lucksinger & Epstein, Washington, D. C., Lem T. Jones, Jr., Kansas City, Mo., for appellant.
 Kenneth Josephson, Asst. U. S. Atty., W. D. Mo., Kansas City, Mo., D. Samuel Borin, Asst. Regional Atty., Dept. of Health and Human Services, Kansas City, Mo., for appellees.
 Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Research Medical Center (Research) appeals the judgment of the district court[1] affirming the decision of the Secretary of Health and Human Services as to Research's reimbursement under the Medicare Act. 42 U.S.C. § 1395 et seq. We affirm the judgment of the district court.
 
 I. Background
 
 2
 Research is a private, non-profit corporation which operates a hospital in Kansas City, Missouri. Since the inception of the Medicare program, it has been a "provider of services" within the meaning of the Medicare Act. See 42 U.S.C. § 1395x(u) (1976 and Supp. IV 1980). As a provider of services to Medicare beneficiaries, Research has agreed not to bill Medicare patients directly for services and items which are covered by the program. See 42 U.S.C. § 1395cc (1976 and Supp. IV 1980). Rather, it seeks reimbursement for the "reasonable cost" of the those services from either the Secretary directly or from a "fiscal intermediary," in this instance Blue Cross of Kansas City, acting as agent for the Secretary for the purpose of reviewing claims and making payments for those services. See Medical Center of Independence v. Harris, 628 F.2d 1113, 1115 (8th Cir. 1980).
 
 
 3
 There is a two-step process in determining the reimbursement due a provider. The first step is to determine which costs are "allowable." The second step is to allocate those allowable costs between Medicare and non-Medicare patients so as to determine "reimburseable costs." The second step, unlike the first, is largely mechanical. The ratio of reimburseable costs to allowable costs is roughly the ratio of Medicare patient-days to total patient-days. In determining a provider's allowable costs, intermediaries rely upon regulations issued by the Secretary pursuant to 42 U.S.C. § 1395hh (1976), and the Provider Reimbursement Manual issued by the Department of Health and Human Services. If the provider of services is dissatisfied with the decision of the fiscal intermediary, it may request an evidentiary hearing before the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo (a) (1976). The Review Board, following the hearing, may "affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report." 42 U.S.C. § 1395oo (d) (1976). The determination of the Review Board stands as a final decision of the agency for the purposes of judicial review unless the Secretary, on his own motion within sixty days of notice of the Review Board's decision, reverses, affirms, or modifies the decision of the Review Board. 42 U.S.C. § 1395oo (f)(1) (Supp. IV 1980). In that event, the action of the Secretary is subject to judicial review. Id.
 
 
 4
 In the instant case, there is a dispute as to allowable costs. Research submitted its cost reports to Blue Cross of Kansas City for its fiscal years ending December 31, 1973, 1974, and 1975. Those reports claimed reimbursement for, among other things, interest on loans secured for the purpose of constructing a student housing facility, certain other interest costs, and the cost of operating and maintaining a coffee shop within its hospital facility. Those claims were denied by the fiscal intermediary. On appeal, the Review Board upheld the disallowance of Research's claim for reimbursement, as a current expense, of its interest costs, but it reversed the fiscal intermediary's disallowance of the coffee shop costs. The Administrator of the Health Care Financing Administration, acting pursuant to authority delegated by the Secretary, affirmed the decision of the fiscal intermediary and the Review Board as to interest costs, and modified the decision as to coffee shop costs to permit reimbursement only for those costs attributable to use by patients and employees of the hospital, including doctors, nurses, volunteers, and students.
 
 
 5
 Research brought this action in district court seeking judicial review of the Secretary's decision pursuant to 42 U.S.C. § 1395oo (f)(1) (Supp. IV 1980). This case was referred to a magistrate, who recommended that Research's motion for summary judgment be denied and the Secretary's be granted, affirming the decision of the Secretary. The district court adopted the magistrate's recommendations. This appeal followed.
 
 II. Standard of Review
 
 6
 Before evaluating Research's claims, it is important to understand our standard of review. The Medicare Act contains a section specifically on judicial review of Review Board decisions as modified by the Secretary. 42 U.S.C. § 1395oo (f)(1) (Supp. IV 1980). This section directs the district court to try an action seeking review pursuant to 5 U.S.C. §§ 701-706 (1976), the judicial review sections of the Administrative Procedure Act. Under 5 U.S.C. § 706(2), a reviewing court is directed to hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 7
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 8
 ....
 
 
 9
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (or)
 
 
 10
 ....
 
 
 11
 (E) unsupported by substantial evidence (.)
 
 
 12
 See also Medical Center of Independence, 628 F.2d at 1117.
 
 
 13
 Also, the Secretary's interpretation of the applicable statutes is entitled to considerable deference. Congress established general guidelines for the Secretary for determining reasonable costs in 42 U.S.C. § 1395x(v)(1) (1976 and Supp. IV 1980), and it authorized the Secretary to prescribe such regulations as may be necessary to carry out the administration of the Act. 42 U.S.C. § 1395hh (1976). It is well settled that we should give deference to the interpretation given a statute by the agency charged with its administration. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Blue Cross Association v. Harris, 622 F.2d 972, 978 (8th Cir. 1980), and cases cited therein. See also Medical Center of Independence, 628 F.2d at 1117, 1118.
 
 
 14
 Research argues that the court should not give too great a degree of deference to the Secretary. Research urges us to adopt a standard of review embraced by the Third Circuit: "(C)ourts remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented." Daughters of Miriam Center for the Aged v. Mathews, 590 F.2d 1250, 1258 (3d Cir. 1978). The court in that case went on to exercise its "independent judgment" regarding Medicare regulations. Id. Research suggests that this non-deferential standard of review is especially appropriate when the agency has a fiscal interest in its interpretations.
 
 
 15
 Like the Third Circuit, we do not accord absolute deference to agency interpretations of their regulations. However, to the extent the Third Circuit is exercising "independent judgment" in interpreting regulations, it is inconsistent with the standard of review of the Eighth Circuit. The Secretary's fiscal interest does not alter our standard of review. See Medical Center of Independence, 628 F.2d at 1117.
 
 III. Analysis
 A. Interest Expense
 
 16
 Three of the issues involve the manner in which reimbursement of Research's interest expense was determined.
 
 
 17
 1. Capitalization of Construction Interest Expense
 
 
 18
 In 1971 and 1972, Research built a student housing facility for residents, interns, and student nurses on a site adjacent to the hospital facility. The bulk of the construction money came from borrowed funds. During the period of actual construction, Research incurred a substantial interest expense. Section 206 of the Provider Reimbursement Manual requires that the interest expense be capitalized over the useful life of the building (thirty years). This means Research's reimbursement (based on the percentage of Medicare patients) would be spread over thirty years. Research wants the interest expense treated as a current expense, which would result in immediate reimbursement for the Medicare patient percentage. Section 206 is not a legislative regulation with the force of law, but an interpretative rule. Good Samaritan Hospital, Corvallis v. Mathews, 609 F.2d 949, 954 (9th Cir. 1979).
 
 
 19
 Research argues that requiring capitalization is contrary to the statutory and regulatory authority which requires payment of its allowable costs on a current basis. According to Research, the capitalization requirement is contrary to the statute which requires that regulations take into account both direct and indirect costs so that the costs of delivering services to Medicare patients are not borne by non-Medicare patients. 42 U.S.C. § 1395x(v)(1)(A)(i) (1976). Research also relies upon the provisions of the following regulations which the Secretary has promulgated: (1) 42 C.F.R. § 405.419(a), which provides, in part, that "(n)ecessary and proper interest on both current and capital indebtedness is an allowable cost," (2) 42 C.F.R. § 405.402(a) and (b)(1), which requires that "(i)n formulating methods for making fair and equitable reimbursement for services rendered beneficiaries of the program, payment is to be made on the basis of current costs of the individual provider" and that "(t)he methods of reimbursement (employed) should result in current payment so that institutions will not be disadvantaged ... by having to put up money for the purchase of goods and services well before they receive reimbursement," (3) 42 C.F.R. § 405.402(a), which provides that "the share of the total institutional cost that is borne by the (Medicare) program is (to be) related to the care furnished beneficiaries so that no part of their cost would need to be borne by other patients," and (4) 42 C.F.R. § 405.406(a), which requires that generally accepted accounting practices in the health care and hospital fields be followed in maintaining financial records for the Medicare program. Research asserts that these regulations prohibit the Secretary's capitalization requirement.
 
 
 20
 The capitalization requirement of § 206 of the Provider Reimbursement Manual attempts to implement the statutory requirement that Medicare costs should not be borne by non-Medicare patients. Capitalization allows the Medicare reimbursement to change as the percentage of Medicare patients in a medical facility changes over the years. A rate that changes over the capitalization period would better reflect the proportion of Medicare patients benefiting from the new facility. If the interest expense were currently reimbursed, and Research withdrew from the Medicare program shortly after the construction was completed, Research's non-Medicare patients would benefit for many years from a Medicare reimbursement. The Secretary's determination that capitalization of interest best implements the statute is reasonable. As we said in § II, supra, we give deference to the Secretary's interpretation of the statute. Section 206 has a reasonable basis in law and does not frustrate congressional policy. We, therefore, uphold the Secretary's interpretation. See Medical Center of Independence, 628 F.2d at 1118. See also Gosman v. United States, 573 F.2d 31, 41 (Ct.Cl.1978).
 
 
 21
 Furthermore, our decision is consistent with the decisions of other courts which have considered arguments similar to Research's and likewise rejected them. Good Samaritan, 609 F.2d at 954-56. St. Francis Memorial Hospital v. United States, 648 F.2d 1305, 1307-08 (Ct.Cl.1981). Research argues that these cases are not on point because they involved new facilities, and Research's student housing was an expansion. We agree with the magistrate that substantial evidence exists to support a finding that the student housing facility should be treated as new construction.
 
 
 22
 2. Offset of Interest Income Against Interest Expense
 
 
 23
 A Medicare regulation requires that in determining reimburseable interest expense, interest income must be offset against interest expense. That regulation makes "necessary" interest expense an allowable cost and, in defining necessary, states: "Necessary requires that the interest ... (b)e reduced by investment income ...." 42 C.F.R. § 405.419(b)(2)(iii).[2] Research argues that the Secretary erred in applying this regulation to two special accounts Research established. The money in these accounts can be used only for specified purposes, i.e., paying the principal or interest on bonds or covering the costs of unusual repairs or replacements.
 
 
 24
 Research's argument is that because the requirement that investment income be used to offset interest expense appears in the course of the definition of the term "necessary" as it applies to interest expense, the offset requirement must be limited to instances where the interest income could be used in lieu of borrowing. Research argues that since it cannot use the money in these special accounts for expansion projects, the investment income these accounts generate does not make Research's borrowing for its projects any less necessary.
 
 
 25
 The regulations do not explicitly limit offsets to situations where borrowing is not necessary. Regulation 405.419(b)(2)(iii) lists specific exceptions to the offset requirement (for grants and gifts); the inability to currently use the investment income is not one of the listed exceptions. Furthermore, the investment income reduces Research's need to borrow from other funds. The fact that Research set up a restricted fund should not allow it to circumvent the offset requirement. The Secretary's determination that investment income, even if not currently available for unrestricted use, should be considered in determining what is a "necessary" interest expense is reasonable and will be upheld.
 
 3. The Funding of Depreciation
 
 26
 Research has maintained a funded depreciation account into which it deposits excess operating funds. The account has been used for improvement, replacement, and expansion of facilities. The amount in this account exceeded historical depreciation. Research deliberately and prudently maintained this excess to have money available for replacement costs (which would exceed the original costs) and for expansion.
 
 
 27
 Under 42 C.F.R. § 405.415(e), investment income from a funded depreciation account is not to be used to reduce interest expense. However, § 226.3 of the Provider Reimbursement Manual limits this exception to the offset requirement to income produced from the amount in the fund which reflects historical depreciation. As a result, the Secretary has required Research to offset the investment income which came from the amount in the account in excess of historical depreciation. Research asserts that the exception cannot be limited in such a way.
 
 
 28
 Research argues that the purpose of not requiring offset with funded depreciation accounts is to encourage medical facilities to accumulate funds for replacement and expansion of facilities, thus reducing borrowing costs. A reduction in borrowing costs results in savings to the government because much of the borrowing costs would be allowable costs. The purpose of encouraging an accumulation of funds is best achieved by excepting all of the income from the depreciation account from the offset requirement. Research also argues that § 226.3 of the Provider Reimbursement Manual allows for depreciation to be calculated on the basis of replacement costs, rather than historical costs.
 
 
 29
 Research's argument that depreciation refers to replacement, rather than historical, costs is contrary to usual accounting practices.
 
 
 30
 Research's other argument appears to be that the Secretary must adopt regulations which fulfill one of the purposes of a statute to as great an extent as possible. First, we give deference to the Secretary's determination as to what incentives are appropriate for achieving an underlying purpose of the Act. Second, we give deference to the Secretary in determining how to balance conflicting goals of the Act. For instance, if medical institutions should be given a greater incentive to accumulate funds to reduce future borrowing costs, reimbursements in the short run would be higher. The Secretary's decision to limit the exception to the offset requirement to historical costs is a reasonable accommodation of the competing interests.
 
 B. Coffee Shop Costs
 
 31
 Research's last claim goes to reimbursement for losses it sustained in operating its coffee shop. Roughly one-fourth of the coffee shop customers were staff members and patients; the rest were visitors. The Secretary determined that provision of a coffee shop for visitors is not a necessary expense, and therefore disallowed reimbursement of the proportion of the loss attributable to visitors. The Secretary reversed the decision of the Provider Reimbursement Review Board on this issue.
 
 
 32
 There are two parts to Research's argument that the Secretary should be reversed on this issue. The first is that the regulation which defines "necessary and proper" costs, 42 C.F.R. § 405.451(b)(2), must be read to include the coffee shop expenses attributable to visitors. That regulation reads: "Necessary and proper costs are costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." (Emphasis added.)
 
 
 33
 The second part of Research's argument is that disallowance of visitor expenses for the coffee shop is inconsistent with the Secretary's allowance of other visitor-oriented costs, such as waiting rooms, lobbies, and parking lots. The Provider Reimbursement Manual specifically allows reimbursement for parking facilities.
 
 
 34
 First we point out that the fact that the Secretary reversed the decision of the Review Board does not change our standard of review. Medical Center of Independence, 628 F.2d at 1117. Of course, the Review Board's decision is part of the "whole record" which we must review, see 5 U.S.C. § 706 (1976), but that does not mean that we give less deference to the Secretary.
 
 
 35
 The first part of Research's argument can be disposed of easily. The phrase "necessary and proper" has some ambiguity, and the Secretary is in a much better position than this court to decide which costs are "necessary and proper," or are "common and accepted occurrences in the field of the provider's activity." We cannot say that there is anything inherently arbitrary in the Secretary's decision.
 
 
 36
 The second part of Research's argument is more troublesome. Allowing costs for visitor services other than the coffee shop could indicate that disallowing the coffee shop costs was an arbitrary act, which we would reverse pursuant to 5 U.S.C. § 706(2)(A) (1976). See Skidmore v. Swift and Company, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).
 
 
 37
 A careful review of the facts convinces us that distinguishing the coffee shop from other visitor services, like parking lots, waiting rooms, and lobbies, is not arbitrary. First, the coffee shop supplements a main cafeteria at Research's facility. The coffee shop opens at 7:00 a. m., an hour after the main cafeteria opens, and it remains open until 9:00 p. m., two and a half hours after the main cafeteria closes. Therefore, visitors would not be without a place to eat during the normal meal hours, even if there were no coffee shop. Second, the lack of waiting rooms and a lobby would be more likely to interfere with patient care than would the lack of a coffee shop. Visitors who had to roam halls would be likely to impede the staff in their duties and create security problems. The lack of a coffee shop would not have such an effect. Third, the lack of parking facilities would be a greater deterrent to visitors than would the lack of a coffee shop. (It is undisputed that visitors are generally helpful for patient care.) Nearly every visitor would need a place to park, but only those who make long visits would need a place to eat. Furthermore, even those who would make long visits would have a place to eat until 6:30 p. m. Parking on the street is not a realistic alternative. The lack of a lot would in itself be a deterrent to visitors, who would not want to have to search for a parking place or make a long walk to the hospital. Also, having visitors park on the street could damage a medical facility's relationship with the neighborhood. This damage could foster opposition to the facility's plans for expansion or other improvements intended to raise the quality of care.
 
 
 38
 In light of these considerations, it is reasonable to believe that the lack of a coffee shop would have a minor effect on the number of visitors compared with the lack of waiting rooms, lobbies, or parking lots. Although our thinking on the coffee shop issue is not in full accord with that of the Secretary, we are neither the finders of fact nor are we writing on a clean slate. The question appears to be a close one but as an appellate court we cannot say that the Secretary's decision is arbitrary or capricious or unsupported by substantial evidence. Therefore, the Secretary's decision to distinguish the coffee shop from other visitor services will be upheld.
 
 
 39
 The judgment of the district court is affirmed.
 
 
 
 [1]
 The Honorable Scott O. Wright, United States District Judge, Western District of Missouri
 
 
 [2]
 42 C.F.R. 405.419(b)(2)(iii) reads in its entirety:
 (2) Necessary. Necessary requires that the interest:
 (iii) Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court (as described in § 405.454(1)) is not used to reduce interest expense.