**CREIGHTON OMAHA REGIONAL HEALTH CARE CORPORATION, a Nebraska nonprofit corporation, Appellee,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Appellant.**

**CREIGHTON OMAHA REGIONAL HEALTH CARE CORPORATION, a Nebraska nonprofit corporation, Appellant,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Appellee.**

Nos. 85–2160, 85–2161.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1986.

Decided July 1, 1987.

Lyman L. Larsen, Omaha, Neb., for appellant.

Frances Reddis, Kansas City, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and HANSON,* Senior District Judge.

---

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

BRIGHT, Senior Circuit Judge.

Creighton Omaha Regional Health Care Corporation, d/b/a St. Joseph's Hospital (Hospital), challenges the district court's [1] decision reviewing the Secretary of Health and Human Services' determination regarding cost reimbursement under the Medicare Act. The district court upheld the Secretary's determination that the Hospital's Intermediate Care Unit does not meet the criteria for a "special care unit" for reimbursement purposes. In his cross-appeal, the Secretary challenges the district court's reversal of the Secretary's decision that costs from a computerized arrythmia monitoring system used in the Hospital's Intensive, Cardiac, and Intermediate care units are not reimbursable as "ancillary services." For the reasons stated below, we affirm the district court's decision with regard to the special care unit issue, but we vacate the district court's decision concerning the ancillary service issue and direct the district court to remand this issue to the appropriate administrative body for further proceedings.

## I. BACKGROUND

### A. Medicare Program

Under the Medicare Act, 42 U.S.C. §§ 1395–1395zz (1982 & Supp.1985), hospitals that qualify as "providers" of medical services must furnish medical care to Program beneficiaries. In return, the Program reimburses the provider for the "reasonable cost" of the services, as defined by the Act and regulations promulgated thereunder. Statutory responsibility for administering the Program resides in the Secretary of Health and Human Services. The Secretary, however, has delegated the responsibility to the Health Care Financing Administration.

The Secretary reimburses providers under the Program through "Intermediaries" —public or private organizations nominated by a provider for the purpose of contract-

1. The Honorable C. Arlen Beam, Chief United States District Judge for the District of Nebraska.

ing with the Secretary in order to determine the amounts payable under the Program. Periodically, the Secretary publishes and updates a Provider Reimbursement Manual (PRM) through which he communicates his position and policies to the contractual intermediary for implementation of the Medicare regulations.

## B. The Hospital

St. Joseph's Hospital is a 587–bed nonprofit, general, short-term care facility located in Omaha, Nebraska. As part of its comprehensive service, the Hospital has maintained both Intensive (ICU) and Cardiac Care Units (CCU). In 1972, the Hospital established an "Intermediate Care Unit" (IMCU) which is the center of controversy in this appeal.

Vast changes and new developments in the coronary care field prompted the Hospital to establish the IMCU. Despite the tremendous success generally of coronary care units, many high-risk patients died after being transferred from a coronary care unit to a routine care unit. Medical research, however, shows that mortality rates for cardiac patients can be reduced if the specialized care and surveillance available in coronary care units is duplicated, but with fewer restrictions, in another unit. This new type of unit is often referred to as a "step-down" or "subintensive" care unit. The IMCU serves as such a "step-down" unit.

All beds in the Hospital's ICU, CCU, and IMCU have cardiac monitoring capacity. The cardiac monitoring available in the IMCU, however, is more flexible than the type of monitoring used in either the ICU or CCU. While both the ICU and CCU employ only "hardwire" monitoring, the IMCU offers "telemetry" monitoring. Telemetry monitoring utilizes a remote unit that attaches to the patient and allows him or her to walk. The Hospital does not provide cardiac monitoring in its routine care areas.

In addition to the extensive conventional monitoring devices, the Hospital also utilizes a unique computerized arrythmia monitoring system. The system, developed by Creighton University, is not commercially available. Specially trained technicians constantly verify machine accuracy and adjust the system to the needs of individual patients. The system functions as an independent, accurate, and effective supplement to the conventional monitoring system and allows nurses to deliver more direct patient care. Furthermore, the computerized system aids the identification of heart rhythm problems.

## C. Proceedings Below

Prior to December 31, 1976, the Hospital's Intermediary, Mutual of Omaha, treated the IMCU as a special care unit for Medicare reimbursement purposes. On June 19, 1980, however, the Intermediary issued a Notice of Amount of Program Reimbursement for the cost reporting year ending December 31, 1977. In effect, the notice reclassified the IMCU from "special care unit" to a unit within the "general routine care area" for cost purposes.[2] The Intermediary based its decision on revised PRM § 2202.7 issued by the Secretary in June of 1977. Similar notices and reclassifications were made for the cost reporting years ending in 1976 and 1978. Consequently, for the years 1976, 1977, and 1978, the Hospital received $60,000, $110,000 and $350,000 less than under the earlier applicable regulations.

The Hospital appealed the Intermediary's determination to the Provider Reimbursement Review Board (PRRB). Although the PRRB concluded that the IMCU did not qualify as a special care unit, it found, on its own motion, that the computerized monitoring service provided in the ICU, CCU, and IMCU should be treated as an "ancillary service." The effect of this decision would allow the Hospital to recoup some, if not all, of the reimbursement amounts the Hospital had lost.

---

**2.** Medicare reimbursement is greater for special care units because the cost of providing basic services is higher. Costs that exceed the Secretary's limit for a particular cost center are not reimbursed. Thus, reclassification of the IMCU results in lower reimbursement, and the higher costs involved in providing IMCU care are not compensated.

The Deputy Administrator of the Health Care Financing Administration reviewed the PRRB's decision. The Administrator upheld the PRRB's decision regarding the special care unit, but overturned the decision to categorize the computerized monitoring system as an ancillary service. As the final decision of the agency, the Administrator's decision also represents the Secretary's decision.

The Hospital appealed the Secretary's decision to the district court. After receiving a recommendation from the United States Magistrate, the district court affirmed the Secretary's decision with respect to the special care unit, but reversed the Secretary with respect to the ancillary service issue. In effect, the district court reinstated the PRRB's initial decision.

## II. ANALYSIS

This case presents two issues: (1) whether the Secretary's criteria interpreting the definition of a "special care unit" as published in the Provider Reimbursement Manual, HIM 15–1, § 2202.7, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; and (2) whether the Secretary's criteria for classifying a service as "ancillary" are plainly erroneous or inconsistent with the regulation.

We apply a well-recognized standard on review. We may not set aside the Secretary's decision unless it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law. An administrative agency's interpretation of its own regulations deserves considerable deference. *Research Medical Center v. Schweiker*, 684 F.2d 599, 602 (8th Cir.1982); *Medical Center of Independence v. Harris*, 628 F.2d 1113, 1117 (8th Cir.1980). A reviewing court should not reject reasonable ad-

ministrative interpretation even if another interpretation may also be reasonable. *Blue Cross Assoc. v. Harris*, 622 F.2d 972, 978–79 (8th Cir.1980) (quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). An agency interpretation, however, that is plainly erroneous or inconsistent with the regulation must be reversed. *Abbott-Northwestern Hosp. v. Schweiker*, 698 F.2d 336, 340 (8th Cir.1983); *Columbus Community Hosp. v. Califano*, 614 F.2d 181, 187 (8th Cir.1980).

### A. Special Care Unit

42 C.F.R. § 405.452(d)(10) (1978) determines whether the IMCU should be reimbursed as a special care unit. At all times relevant to the case the regulation provided as follows:

> To be considered an intensive care unit, coronary care unit, or other special care inpatient hospital unit, the unit must be in a hospital, must be one in which the care required is extraordinary and on a concentrated and continuous basis and must be physically identifiable as separate from general patient care areas. There shall be specific written policies for each of such designated units which include, but are not limited to burn, coronary care, pulmonary care, trauma, and intensive care units but exclude postoperative recovery rooms, postanesthesia recovery rooms, or maternity labor rooms.

*Id.* The parties agree that the only requirement in dispute is whether the care provided by the IMCU is "extraordinary and on a concentrated and continuous basis."

In 1977, the Secretary revised PRM § 2202.7 to clarify the agency's position regarding the proper classification of subintensive units.[3] The Secretary contends

---

**3.** Revised section 2202.7, in pertinent part, provided as follows:

> B. *Subintensive Units.*—Some hospitals have units which provide more intensive care than that provided in the general care areas yet not sufficiently intensive to permit the unit to meet the requirements to qualify as a special care unit under the definition [of extraordinary, concentrated and continuous care].

These units are typically designated as subintensive, subacute, progressive, or intermediate care units, etc. Such subintensive units are not special care units for purposes of Medicare reimbursement.

There may, however, be cases where a unit is not easily identified as a subintensive or special care unit without further study. In such cases, a review of the written policies of the

that the facility in question must be compared to the categories of facilities enumerated in the regulations (burn, coronary, pulmonary care, trauma, and intensive care). If the facility in question is not comparable to the enumerated facilities, then it cannot qualify as a special care unit even though the facility renders care over and above the care that is rendered in a routine area. According to the Secretary's revised manual provision, a critical factor in this comparison is the level of nursing care provided by the facility seeking special care unit status. If the number of nursing hours per patient day for the facility in question are substantially lower than the number of nursing hours per patient day for a recognized special care unit (ICU or CCU), then the facility will not qualify as a special care unit.

We note that the issue surrounding the Secretary's interpretation is one of first impression in our court. The issue, however, is no stranger to other circuits. *See St. Elizabeth Hosp. v. Bowen,* 797 F.2d 449, 452 (7th Cir.1986); *Butler County Memorial Hosp. v. Heckler,* 780 F.2d 352, 355 (3d Cir.1985); *Carraway Methodist Medical Center v. Heckler,* 753 F.2d 1006, 1008–09 (11th Cir.1985); *NKC, Inc. v. Secretary of Health & Human Services,* 747 F.2d 1100, 1101 (6th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985); *St. Elizabeth's Hosp. v. Secretary of Health & Human Services,* 746 F.2d 918, 919 (1st Cir.1984) (per curiam); *Lexington County Hosp. v. Schweiker,* 740 F.2d 287, 289–90 (4th Cir.1984); *Villa View Community Hosp. v. Heckler,* 728 F.2d 539, 539–40 (D.C.Cir.1984) (per curiam);

*Sun Towers, Inc. v. Schweiker,* 694 F.2d 1036, 1037 (5th Cir.1983).

◾ We determine that the Secretary was entitled to revise PRM § 2202.7 because the regulation is ambiguous. First, the terms "extraordinary * * * concentrated and continuous" encompass a variety of meanings. For example, the dictionary defines "extraordinary" as "beyond what is usual, regular, common, or customary * * * [or] exceptional to a very marked extent." *Webster's Third New Int'l Dictionary* (unabridged) 807 (1967).

The Secretary maintains that "extraordinary" as used in the regulation refers to the latter meaning. Under the Secretary's approach, the level of care provided in the general routine patient care area is the usual, regular, and common level of care. To qualify as a special care unit, the Secretary contends that the level of care must be more than merely above that which is usual or common, it must be "exceptional to a very marked extent." ICUs and CCUs provide such a level of exceptional care. Thus, the Secretary maintains it is necessary to compare the level of care in units seeking special care unit status to the level of care provided in an ICU or CCU to see whether the level of care provided is "extraordinary * * * and on a concentrated and continuous" basis.

Second, changes that had occurred in the medical industry highlighted the ambiguity in the regulation. The growth of health care services providing gradations of care instead of only intensive and general care necessitated a clarification of the regulation. We are not alone in ruling the regulation ambiguous because of changes in the

various units will indicate whether a unit is or is not providing care [on an extraordinary, concentrated and continuous basis]. If the intermediary determines that such a unit meets the requirements of [extraordinary, concentrated and continuous care], then the unit will qualify as a special care unit.
For example, one indication of whether the unit in question meets the requirements [for extraordinary, concentrated and continuous care] is the extent of nursing services provided in the unit. If the hours of nursing service per patient day are less than the hours of nursing services provided in an established

special care unit, such as an ICU or CCU in that hospital or in other area hospitals if the hospital has no established special care unit, then the unit in question would generally not qualify as a special care unit. Hospitals should maintain such records as are needed to establish the nursing time in such units. Another example is when the patients in the unit in question are generally transferred there from a qualified special care unit after their condition has improved. This would indicate that the intensity of care required is less than needed to qualify [as extraordinary, concentrated and continuous].

health care industry. *See Carraway Methodist Medical Center*, 753 F.2d at 1010.

The Secretary's interpretation of an ambiguous regulation must still meet the test of reasonableness. *See Columbus Community Hosp.*, 614 F.2d at 187. The Secretary's interpretation that hospital units seeking special care status must provide a level of care comparable to the level of care provided in recognized special care units is reasonable. *See Butler County Memorial*, 780 F.2d at 356–57; *St. Elizabeth's Hosp.*, 746 F.2d at 919; *John Muir Memorial Hosp. v. Schweiker*, 664 F.2d 1337, 1338–39 (9th Cir.1981); *White Memorial Medical Center v. Schweiker*, 640 F.2d 1126, 1129 (9th Cir.1981).

The Hospital also argues that the Secretary's interpretation is inconsistent with the regulation. We disagree. First, the regulation does not expressly prohibit comparisons between hospital units seeking special care status and recognized units. Second, the regulation suggests that ICUs and CCUs are merely specific types of special care units themselves. Comparing recognized special care units to units seeking special care status is wholly consistent with the thrust of the regulation.

The Hospital next contends that revised PRM § 2202.7 constituted a substantive change in the regulation. The Hospital argues that the manual revision effectively amended the regulation, and, therefore, a change was made in contravention of the rule-making process of the Administrative Procedure Act, 5 U.S.C. § 553 (1982).

The Hospital's contention is without merit. First, provisions in the Provider Reimbursement Manual and amendments thereto are "interpretive rules," not subject to the rule-making process of section 553. *Columbus Community Hosp.*, 614 F.2d at 187; *John Muir Memorial Hosp.*, 664 F.2d at 1339. Second, the Secretary issued the revised manual provision in response to changes that had occurred in the medical industry. Under this circumstance, tne

Secretary's action does not constitute a "substantive" change merely because he issues an interpretation of existing regulations that negatively affects the Hospital.

As to the application of PRM § 2202.7, substantial evidence on the record as a whole supports the Secretary's determination that the Hospital's IMCU is not a special care unit. Although the level of care provided in the IMCU is greater than the level provided in a routine care unit, it is considerably less than that provided in an ICU or CCU. The Hospital's own evidence shows that the nurse-to-patient ratio and the number of nursing hours per patient for the IMCU are significantly less than the same figures for either the ICU or CCU. Written Hospital policy regarding the IMCU states that the unit's purpose is to provide care to patients who no longer require intensive care. Almost every measure of the level of care indicates that the IMCU does not provide the same kind of care as an intensive care unit.

Finally, the Hospital argues that by denying the IMCU special care unit status, the Secretary is unlawfully shifting Medicare costs to non-Medicare patients because the difference between the IMCU's utilization rate (59%) and the utilization rate for the routine care area (34.8%) will mean less reimbursement.[4] The Ninth Circuit rejected a similar argument as having no merit. *See John Muir Memorial Hosp.*, 664 F.2d at 1339. If the Hospital's argument prevails, no cost could ever be disallowed because the cost could shift to non-Medicare patients. *See St. Elizabeth's Hosp.*, 797 F.2d at 455. Because the Secretary reasonably determined that the IMCU did not qualify for reimbursement as a special care unit, his decision did not contravene the prohibition on cost-shifting. Accordingly, we affirm the district court's decision concerning the special care unit.

## B. Ancillary Services

The regulation, 42 C.F.R. § 405.452(d)(3) (1978), defines "ancillary services" as "ancillary services or special services are the

---

**4.** 42 U.S.C. § 1395x(v)(1)(A) (1982 & Supp.1985) provides that necessary costs of treating Medi-

care patients may not be shifted to non-Medicare patients.

services for which charges are made in addition to routine services."

Both parties agree that PRM § 2202.8 is relevant in determining whether a particular item or service is ancillary. PRM § 2202.8 states that:

[a]ncillary services in a hospital or an SNF [Skilled Nursing Facility] include laboratory, radiology, drugs, delivery room (including maternity labor room), operating room (including postanesthesia and postoperative recovery rooms), and therapy services (physical, speech, occupational). Ancillary services may also include other special items and services for which charges are customarily made in addition to a routine service charge.

Relying on section 405.452(d)(3) and PRM § 2202.8, the PRRB concluded that the computerized arrythmia monitoring services should be reimbursed as an "ancillary service" with its own cost center. The PRRB clearly relied on the Hospital's charging system as a basis for determining whether the computerized monitoring system was an ancillary service.

The appropriate manual provision, however, regarding the use of a Provider's charging system as a basis for determining whether a service is ancillary or routine is PRM § 2203. In part, section 2203 provides:

A separate ancillary charge for a particular item or service other than those listed as ancillary in [PRM] § 2202.8 is not recognized, and the cost of the item or service is not included in an ancillary cost center, *where the common or established practice of providers of the same class (hospital or SNF) in the same State is to include the item or service in the routine service charge.*

PRM § 2203 (emphasis added).

■■■ Thus, the custom or established practice of providers of the same class in the same state of the provider to include an item or service in the routine service charge is an important, if not the sole, criterion for classifying a service as "ancillary" when the service is not listed in section 2202.8. If there is no established classification of a service as ancillary or routine by the relevant group of providers, then PRM § 2203 recognizes the charging practice of the particular provider if the provider's established charging practice is consistently followed for all patients and the practice does not result in an inequitable apportionment of costs to the Medicare program.

■■■ Based on the above, it is clear that the PRRB improperly relied on the similarity of the computerized monitoring service to other services recognized as ancillary when it determined that the Hospital's charging practice controlled the classification of the system. A review of the record indicates that no evidence before the PRRB addressed whether providers of the same class in the same state included or did not include computerized monitoring services (or perhaps analogous services or items) as a routine service charge. Furthermore, the PRRB failed to inquire whether the Hospital's charging practice resulted in an inequitable apportionment of costs to the Medicare program.

The proper application of the ancillary service regulation and manual provisions to the computerized monitoring system requires a factual determination that cannot be made on this record. Although the Hospital has submitted an affidavit in an attempt to establish that there is no common practice, the affidavit and its survey are insufficient.[5] The affidavit does not identify the type of service for which the sur-

---

5. The affidavit by Roger Hasenkamp, Medicare Analyst for the Hospital, stated that:

[Hasenkamp] conducted a survey of seven major Omaha hospitals, including Saint Joseph Hospital, three Lincoln, Nebraska hospitals, and two Council Bluffs, Iowa hospitals to determine which hospitals rendered a separate charge to the patient for monitoring services. Attached hereto and marked Exhibit 1

is the result of that survey. The results do not show any established custom for comparable hospitals in this vicinity to include monitoring services in their routine charges. [R. 32.]

The survey results indicated that 12 hospitals had been polled. No explanation was given for the discrepancy between the number of hospitals the affiant stated he surveyed and the num-

vey was conducted,[6] nor can it be determined whether the survey included all the hospitals in Nebraska. Without clearer survey results, we cannot say whether an established practice did or did not exist. Even if we could determine that no established practice existed, a fact finder would still have to determine whether the Hospital's charging practice resulted in an inequitable apportionment of costs to the Medicare program. Accordingly, we vacate the ruling of the district court on this issue so it may remand this case to the PRRB for factual determinations under PRM § 2203.

On remand, the PRRB should also consider the propriety of the additional criteria that the Secretary seeks to impose on ancillary services. The Secretary would require that an ancillary service be: (1) therapeutic or diagnostic; (2) provided on specific written order; and (3) offered to facilitate the professional services of the physician. The PRRB should consider whether the Hospital received fair notice of the Secretary's intentions, whether these criteria are consistent with prior interpretations, and whether they should be applied in this case.

### III. CONCLUSION

For the reasons stated above, we affirm the district court's decision with regard to the special care units. We vacate the ruling concerning ancillary care services and direct that this issue be referred to the PRRB for resolution.

---

ber of hospitals that appear in the survey results.

**6.** Under PRM § 2203, we are not sure whether the relevant service should be "monitoring service" or specifically "computerized monitoring services." We feel that the issue is best addressed by further administrative proceedings and not by the court at this time.