**ST. BERNARD'S HOSPITAL, INC. d/b/a St. Bernard's Regional Medical Center, Plaintiff,**

**v.**

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services of the United States, Defendant.**

**No. J–C–89–185.**

United States District Court, E.D. Arkansas, Jonesboro Division.

Sept. 16, 1991.

---

John C. Deacon, Berl A. Smith, Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for plaintiff.

William C. Adair, Jr., Jana K. Brown, U.S. Attorney's Office, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION AND ORDER OF REMAND

EISELE, District Judge.

The parties' cross-motions for summary judgment are before the Court. This case concerns the implications of certain Medicare hospital insurance program financial arrangements. The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 1395oo (f)(1) and 28 U.S.C. § 1331.

Plaintiff, St. Bernard's Hospital, doing business as St. Bernard's Regional Medical Center ("St. Bernard's"), asks the Court to overturn an adverse decision of the Deputy Administrator of the Health Care Financ-ing Administration. Defendant, Louis W. Sullivan, the Secretary of Health and Human Services, asks the Court to affirm the Deputy Administrator's decision. The decision below denied St. Bernard's partial Medicare reimbursement for interest expense for certain borrowing that the Deputy Administrator determined was "unnecessary" under the Medicare regulations. Plaintiff challenges that determination here. For the reasons discussed below, the Court will grant in part and deny in part plaintiff's motion for summary judgment. The Court will grant in part and deny in part defendant's cross-motion for summary judgment.

### I.) PROCEDURAL BACKGROUND

St. Bernard's seeks reimbursement from the Secretary of Health and Human Services ("the Secretary") for interest expense on borrowing for capital expenditures in fiscal year 1984. Medicare ordinarily provides reimbursement payments to hospitals through private organizations, such as Arkansas Blue Cross, which act as fiscal intermediaries or paying agents under contract with the Department of Health and Human Services. Each health care provider files an annual cost report with the fiscal intermediary. The intermediary subsequently audits the report. After the audit, the intermediary informs the hospital of the amount of reimbursement that the program permits.

When a hospital disagrees with an adverse determination, the hospital may appeal to the Provider Reimbursement Review Board ("the PRR Board"). The Secretary appoints the PRR Board. Two of its five members must be representatives of hospitals or other health care providers. At least one member must be a Certified Public Accountant. The PRR Board has the authority to review de novo the decision of the fiscal intermediary and to issue its own decision.

The Secretary of Health and Human Services may reverse, affirm, or modify the PRR Board's decision. The Secretary has delegated his discretionary authority to the Administrator of the Health Care Financ-

ing Administration. The Administrator has subsequently delegated the authority to the Deputy Administrator of the Health Care Financing Administration.

The fiscal intermediary, Blue Cross, denied reimbursement of interest expense to St. Bernard's for borrowing for capital expenditures to the extent of a balance in St. Bernard's funded depreciation account. Blue Cross determined that the capital expenditures were not "necessary" under the relevant regulations. The PRR Board, reversing Blue Cross, concluded that St. Bernard's "spent down" its funded depreciation account after the unnecessary borrowing. The Deputy Health Care Financing Administrator ("the Secretary" or "the HCF Administrator" or "the deputy administrator") reversed the PRR Board, effectively reinstating the decision of the intermediary, Blue Cross. Plaintiff appeals the HCF Administrator's decision.

Plaintiff and defendant submitted briefs on November 20, 1990. Both parties submitted reply briefs on November 27, 1990. The Court heard oral arguments on December 12, 1990. Both parties subsequently supplemented their arguments with letter briefs. Plaintiff submitted letters in this regard on December 14, 1990, April 1, 1991, and July 2, 1991. Defendant submitted letters on December 17, 1990, June 11, 1991, June 13, 1991, and July 24, 1991. The record indicates that both parties have received copies of the correspondence of the opposing party. Therefore the Court deems the submissions of the parties as part of the record under its advisement.

## II.) FACTUAL BACKGROUND

St. Bernard's began a capital expansion program in 1980. The issues in the case arise in part because St. Bernard's originally planned a $15 million bond issue to fund an expansion project, debt reduction, and other capital expenditures. St. Bernard's obtained a certificate of need for $13.575 million from the Arkansas Health Planning and Development Agency, based in part on the projected $15 million bond issue and the availability of the balance of funds in a "funded depreciation account." St. Ber-

nard's twice reduced the amount of the anticipated borrowing. The hospital ultimately issued bonds in 1982 in the amount of $12.75 million to cover the costs of the program. From the bond proceeds, St. Bernard's used $1,179,845.00 for construction, renovation, and the acquisition and installation of equipment. The hospital used the balance of the proceeds to retire existing debt and to pay various expenses related to the bond issue.

At the time of the 1982 bond issue, St. Bernard's had an account that set aside money to fund the depreciation of its capital equipment. The account, called a "funded depreciation account," is a capital account or savings account that the hospital uses to set aside no more than the amount of money written off its books for the depreciation of capital equipment. Immediately prior to the bond issue, the funded depreciation account had a balance of $1,791,606.00. The balance of the funded depreciation account at all times since the bond issue has been at or above that amount.

The hospital spent $1,179,845.00 of the bond issue on additions, improvements, and renovations, i.e. "project capital" expenditures, that are depreciable asset costs. The fiscal intermediary denied St. Bernard's Medicare reimbursement for the interest expense on the $1,179,845.00 depreciable asset costs because funds were available in the funded depreciation account at the time of the borrowing. The PRR Board, reversing Blue Cross, concluded that St. Bernard's "spent down" its funded depreciation account after the unnecessary borrowing. The deputy administrator reversed the PRR Board and reinstated the decision of Blue Cross. The deputy administrator denied reimbursement of interest expense on the grounds that the borrowing was not "necessary" to meet a financial need of St. Bernard's to the extent it had a surplus in the funded depreciation account.

The interest expense amounted to $130,431.17 for the year. Plaintiff's Medicare ratio was 54.73% at the time. The Medicare ratio indicates what percentage of hospital costs properly may be allocated to the

Medicare system. The regulations allocate other costs to "private patients" outside of the Medicare system. Multiplying the Medicare ratio and the interest expense above gives the amount that the adverse decisions denied plaintiff, i.e., $71,384.98 in interest expense in fiscal year 1984.[1]

## III.) STANDARD OF REVIEW

The Administrative Procedure Act ("APA") determines the scope of the Court's review. The applicable provisions of the APA state:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret ... statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> .       .       .       .       . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> .       .       .       .       .
>>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> .       .       .       . .
>>
>> (E) unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute....

5 U.S.C. § 706 (referred to in 42 U.S.C. § 1395oo (f)(1)); *Research Medical Center v. Schweiker*, 684 F.2d 599, 602 (8th Cir. 1982).

The Eighth Circuit has been more explicit about the application of the APA:

The Court may not set aside the Secretary's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. An administrative agency's interpretation of its own regulations deserves considerable deference. A reviewing court should not reject reasonable administrative interpretation even if another interpretation may also be reasonable. An Agency interpretation, however, that is plainly erroneous or inconsistent with the regulation must be reversed.

*Creighton Omaha Regional Health Care Corp. v. Bowen*, 822 F.2d 785, 789 (8th Cir.1987) (citations omitted); *accord, Columbus Community Hospital, Inc. v. Califano*, 614 F.2d 181 (8th Cir.1980).

## IV.) DISCUSSION

A.) Borrowing is Unnecessary to the Extent That Funded Depreciation is Available.

The Court concludes that the Medicare program established and consistently applied its interpretation of the relevant statutes and regulations requiring a healthcare provider to use funded depreciation when it is "available" before borrowing money for capital expansion. Plaintiff argues that the funds in its funded depreciation account were NOT "available" at the time of the borrowing. There is no support for plaintiff's position in the statute, the regulations, or the agency interpretations of those regulations.

The statute and the implementing regulations do not require the Medicare Program to reimburse interest expense for capital borrowing that is not "necessary" under the terms of the statute. The law is well settled in this area.[2] Plaintiff makes the argument that St. Bernard's borrowing may have been "necessary" based on three cases that, viewed in isolation, seem to

---

1. The implication of an affirmance in this Court would deny plaintiff reimbursement for interest expense essentially until the funded depreciation account drops to zero. Thus the matter concerns more than one year's interest. The *res judicata* effects of the decision may be substantial. *See Sioux Valley Hospital v. Bowen*, 792 F.2d 715, 724 (8th Cir.1986) (court can give prospective relief on recurring question of law between the same parties).

2. Even the PRR Board decision in favor of plaintiff did not rely on this ground. The PRR Board relied on alternative grounds and found that unnecessary borrowing subsequently became necessary borrowing. R. at 30–31.

support the argument. None of the decisions below, i.e., those on review here, supports plaintiffs argument. There are a few cases that, on their face, seem to disagree with the Secretary's position. However, the cases are distinguishable.

The statute entitles a health care provider to reimbursement for the "reasonable cost" of furnishing hospital services to Medicare beneficiaries. 42 U.S.C. §§ 1395f(b) and 1395cc. Generally, "reasonable cost" is "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Medicare regulations provide that interest expense on capital indebtedness is an allowable cost and, thus reimbursable only to the extent that the expense is "necessary and proper." 42 C.F.R. § 405.419(a) (1982).[3]

Interest expense is "proper" if the rate of interest is not greater than what a prudent borrower would pay at the time of incurring the expense, 42 C.F.R. § 405.419(b)(3)(i); and if the health-care provider pays the interest to a lender in an arm's-length transaction, 42 C.F.R. § 405.419(b)(3)(ii). There is no dispute that the interest expense here was "proper" within the meaning of the regulations.

The issue in this case is whether the interest expense was "necessary." For interest expense to be "necessary," it must meet the three-part test set forth in 42 C.F.R. § 405.419(b)(2). The Court sets out the three part test in full:

Necessary requires that the interest:

(i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

(ii) Be incurred on a loan made for a purpose reasonably related to patient care.

(iii) Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court ... is not used to reduce interest expense.

42 C.F.R. § 405.419(b)(2).

The first part of the above test is at issue here, 42 C.F.R. § 405.419(b)(2)(i), i.e., whether St. Bernard's incurred the interest expense on a loan made to satisfy its "financial need." However, the language of the regulation alone would not provide a sufficient basis on which to decide the issues in this lawsuit. The Court must inquire further.

Medicare reimbursement regulations require that interest expense be offset against interest income. 42 C.F.R. § 405.419(b)(2)(iii). Medicare will not reimburse interest expense to the extent that a hospital generates interest income on funds deposited in an interest bearing account. The regulations prevent a hospital from investing its funds without limitations while simultaneously borrowing additional funds that otherwise qualify for reimbursement of interest expense from the Medicare program. If offset were not required, a hospital could both receive interest income from investments while Medicare paid the cost of borrowing money needed for capital expansion. In effect, Medicare would be both subsidizing a hospital's investments *and* paying for the costs of borrowing if the regulations did not require offset.

---

**3.** The Court will use the regulations most favorable to St. Bernard's, i.e., those in effect in 1982. The 1986 recodification of the CFR provisions does not affect the Court's analysis. It has been stated elsewhere that the 1986 recodification did not affect the substantive provisions of the regulations at issue herein. *St. Francis Hospital v. Sullivan,* Civil Action No. 89–291–JJF, Magistrate's report and recommendation, slip op. at 2

n. 1, 1990 WL 284514 (D.Del. July 25, 1990). Because the plaintiff alleges that the Secretary has subsequently "changed the rules of the game" the Court concludes that use of the provisions as they were codified in 1982 simplifies the discussion concerning subsequent changes to certain relevant "guidelines, interpretations, and regulations."

There is an exception to the rule that Medicare will not reimburse interest expense when a hospital has funds on deposit in an interest bearing account. As an incentive for funding a depreciation account, interest income from the funded depreciation account is not offset against interest expense. 42 C.F.R. § 405.415(e). The so-called "Funded Depreciation Account" is an account that hospitals may use to save money to replace capital equipment. The Medicare regulations state that funding of depreciation is "not required" but is "strongly recommended." *Id.* The policy encourages health care providers to set aside reserves that will be needed to replace capital equipment as it depreciates over time. The maximum amount allowed in this account is the amount of depreciation expense of capital assets off of a hospital's books.

The Secretary has interpreted the exception as imposing a condition that providers must use funded depreciation when it is "available." While the regulations do not so explicitly state, the Secretary's interpretation dictates that a hospital use funded depreciation before the Secretary will consider "necessary" any borrowing for capital purposes. Medicare will not reimburse interest expense on borrowing for capital purposes while there are funds in the fund-ed depreciation account. This prevents hospitals with a funded depreciation account from receiving a substantial "double benefit." Medicare will not reimburse interest paid on borrowed funds to the extent that a hospital exempts interest earned on funded depreciation from the normal interest offset rule.

There is a plethora of evidence supporting the Secretary's historical position. The Court sets out the relevant historical documents in full because there seems to be confusion among the courts that have considered this issue.[4] The Secretary states that he has consistently applied this interpretation since 1968.

The first evidence in the record of the Secretary's interpretation comes from Blue Cross Administrative Bulletin # 294–1, dated May 11, 1970, Government's Ex. B. Blue Cross, the fiscal intermediary, gave a one page example illustrating that any funds in a funded depreciation account would have to be used before borrowing other funds would be considered "necessary." The example stated that Medicare would not reimburse interest expense on borrowed funds to the extent that funds were available in the funded depreciation account. The Court sets out the example in the margin.[5]

---

4. The Court is aware of three decisions directly on point. Two decisions support the plaintiff's argument. *St. Francis Community Hospital v. Schweiker,* (CCH), ¶ 34,156 (D.C.S.C.1983); *St. Francis Hospital v. Sullivan,* Civil No. 89–291–JFF (D.Del. March 6, 1991). Another decision supports the Secretary's position. *Sentara Hampton Hospital v. Sullivan,* Civil No. 89–1248, 1991 WL 191241 (D.D.C. May 24, 1991). This Court agrees with the conclusion reached by the court for the district of the District of Columbia. The D.C. court is most frequently charged with interpreting agency rules and regulations.

5. File No. 405.419, Bulletin Number 294–1, Date Issued: May 11, 1970, Page 1 of 1 pages. Other Sources of Information: Reg.Sec. 405.419(2)(i); Provider Reimbursement Manual 202.2, 224.1, 224.2, 226. SUBJECT: INTEREST ON OUTSIDE BORROWING FOR A CAPITAL EXPANSION WHEN PROVIDER HAS A FUNDED DEPRECIATION ACCOUNT.
QUESTION: A Provider has an unrestricted funded depreciation account. For capital expansion purposes money is borrowed from outside sources and the funded depreciation account is not used. Is the interest expense on the outside borrowings allowable? Would the answer be different if the funding of depreciation were required by the terms of a lending agreement in which the creditors restricted the use of the fund by the provider? ANSWER: Since unrestricted depreciation funds are available to the Provider for its capital expansion needs, interest expense on funds borrowed from the outside, to the extent that the Provider's own funds were available, would not be considered "necessary" and therefore would not be allowable.
For example, suppose a Provider has $2,000,000 in an unrestricted funded depreciation account and engages in capital expansion costing $4,000,000. If the Provider borrows $4,000,000 from outside sources, interest expense on $2,000,000 would be disallowed for Medicare purposes since this amount of funded depreciation was available for use by the Provider.
If, in the above example, the funded depreciation amount were restricted by creditors under a prior lending agreement to the extent of $1,000,000, to be used only in the event of default under the prior loan, interest on out-

In Administrative Bulletin # 1186, dated September 9, 1977, Blue Cross issued a comprehensive description of funded depreciation and other problems related to Medicare Cost Reports. Blue Cross issued the comprehensive description to help hospitals avoid having problems with Medicare reimbursement of interest expense. The immediate precipitating factors for issuing the bulletin were two PRR Board decisions in favor of hospitals concerning reimbursement for interest expense when there were funds in the funded depreciation account. The Secretary of Health, Education and Welfare reversed the PRR Board's decisions in both cases. *See* Administrative Bulletin # 1186 at 1; R. at 473 (citing two unpublished cases).

Administrative Bulletin # 1186 is 24 pages. Therefore it is too long to include in this opinion. However, the examples set out in the bulletin fully support the Secretary's position herein. The bulletin quotes from the Provider Reimbursement Manual, part I, § 226:

1.· Interest paid on loans from funded depreciation to the general fund is an allowable cost.

2. Interest earned by the depreciation fund is not offset against allowable interest expense.

3. In order to qualify for the above two provisions, the level of funding is limited to total allowable accumulated depreciation for Medicare on the provider's records.

4. In order to be considered funded depreciation, monies must be on deposit for at least six months.

5. Withdrawals from the funded depreciation account for allowable capital expenditures are made on a first-in-first-out basis.

6. Withdrawals from the funded depreciation for purposes other than allowable capital expenditures are made on a last-in-first-out basis.

7. Interest generated by the amount of a withdrawal treated on a last-in-first-out basis for all periods while in the fund, side borrowing would be disallowed only to

will be offset against allowable interest expense in the year of withdrawal.

Bulletin # 1186 at 2; R. at 474.

The bulletin also set out the following paragraph dealing specifically with the issues at bar:

1. *Borrowing is not necessary to the extent that the provider has other funds available immediately prior to borrowing.*

In applying this premise, funds which are considered available could include excess working capital ..., unrestricted gifts and grants, unrestricted investments, tax support, and in the case of capital expenditures, funded depreciation. Funds, which are not considered "available" included qualified pension funds, trusteed self-insurance reserves, donor restricted funds (unless restricted to the same purpose as the borrowing), and where required by the lender or bond indentures, sinking funds and reserves would not be "available" funds, although income earned on these funds would be offset against interest expense.

Bulletin # 1186 at 4; R. at 477.

In addition, the bulletin set out several very specific examples. There are examples in the bulletin that virtually replicate the situation *sub judice*. *See*, Example 1, Bulletin # 1186 at 10–11; R. at 483–84. The examples have footnotes citing the relevant sections from the Code of Federal Regulations. There also are various applicable references to the Provider Reimbursement Manual.

Blue Cross issued an update to Bulletin # 1186 in 1981. Bulletin # 1186, 81.0 (December 9, 1981); Government's Ex. B1. The update sought to address recent decisions and interpretations by the Health Care Financing Administration. The Court sets out the entire update in full because it has confused other courts. *See, St. Francis Hospital, Inc. v. Sullivan,* Magistrate's Report and Recommendation, Civil No. 89–291–JJF, slip op. at 26 (D.Del. July 25, 1990). The update states:

the extent of $1,000,000.

SUBJECT: MEDICARE PROVIDER COST REPORTS: DISCRETIONARY TIMING OF EXISTING FUNDED DEPRECIATION ACCOUNT EXPENDITURES

ACTION: Implementing policy clarification contained in this bulletin in settling current and future cost reports. Refer possible administrative resolutions of pending appeals on this issue to BCA appeals team.

Based on experience in the application of AB 1186 the HCFA has determined that providers should be given discretion in the timing of expenditures of funded depreciation when *both* the borrowing and the funded depreciation will be necessary to finance a capital project.

The key factors in HCFA's determination are that (1) both funded depreciation and external financing must be required for completion of the capital project and (2) the amount of funded depreciation at the time of borrowing must be used and totally consumed within a short period of time during construction and/or acquisition of the asset. The timeliness of expenditures is emphasized in order to ensure that the provider is not merely delaying the use of funded depreciation in order to gain a source of "offset-free" income from the funded depreciation account.

As a result of this decision, the following criteria reflect current Medicare Program policy concerning the discretionary expenditures.

The requirement that providers use funded depreciation before external financing is not absolute; in certain circumstances, providers should be allowed limited discretion in the timing of existing funded depreciation account expenditures.

Where *both* the funded depreciation account and external financing will be required to complete a capital project, Plans should consider the following:

1) At the time of the borrowing, Plans should review the provider's "up front planning" for the capital project; for example: description of the project and its phases, projected expenses, amount of application of the borrowing, the planned timing of expenditures from the funded depreciation account, etc.

2) Barring exceptional circumstances, the funded depreciation account should be used during the first few years of the project. Some examples of exceptional circumstances might be:

a) The funded depreciation account is committed by the provider to a part of the project for which external financing cannot be obtained.

b) The existing funded depreciation account is used as "escrow" in order to obtain borrowings at a substantially reduced rate. (The term "escrow" as used in this context is a requirement of a debt instrument and is controlled by a third party rather than the provider; the key is that the provider's use of these funds is restricted by a third party).

3) Plans will make the "necessity of borrowing" determination at the time the asset is placed in use. If, at that time, the funded depreciation account balance (at the time of borrowing) has been totally consumed on the project, an adjustment for unnecessary borrowing based solely on the timing of funded depreciation expenditures would not be appropriate. However, in multiphase projects, if the funded depreciation account has not been used or totally consumed by the need of the first phase, the intermediary must determine whether this is consistent with the Plan's findings in steps 1 and 2 or simply an attempt to hold the funded depreciation account until the final stages of the project as a source of "offset-free" investment income.

The necessity of an adjustment will depend upon whether the intermediary is satisfied with the provider's intent to use these funds and with the reasonableness of the delay in their use. The burden of proof is on the provider to demonstrate the intent and underlying rationale.

If the provider's method of structuring long term debt and the proposed use of

funded depreciation seem financially prudent, and there does not appear to be an attempt to arbitrarily delay the use of the funded depreciation account, absent any special considerations, interest expense would be allowed.

Where the funded depreciation account has not been totally consumed at the end of a single phase project, an adjustment to interest expense would be required, subject to 3) above.

These instruction apply *only* to those cases where *both* funded depreciation and external financing are required to complete a capital project; the provider must fully describe and define the capital project in step 1 of the intermediary's examination.

ALL REFERENCES IN THIS AB TO FUNDED DEPRECIATION AND THE FUNDED DEPRECIATION ACCOUNT REFER TO THE AMOUNT IN THE FUNDED DEPRECIATION ACCOUNT AT THE TIME OF THE BORROWING.

NOTE: In situations where *both* funded depreciation and external financing are not required and/or the Intermediary is not satisfied with the provider's intent to use these funds and/or the reasonableness of the delay in their use, the provider will NOT be allowed discretion in the timing of funded depreciation account expenditures. In these cases, the guidelines issued in Administrative Bulletin 1186, 1186,-78.01 and 1186,79.01 are to be followed. This AB does not obsolete previous bulletins in the 1186 sequence.

Plans should apply the above criteria in settling current and future cost reports. If you believe the application of these instructions may result in a possible administrative resolution of an appeal, please forward the proposed administrative resolution together with any supporting documentation to BCA Appeals for approval. All other questions should be directed to your Team Senior Manager, Plan Reimbursement/Settlement Activities, BCA.

Administrative Bulletin # 1186,81.0, Government's Ex. B1.

As the 1981 update itself states, it did not change the previous bulletins in the 1186 sequence. Blue Cross sought to clarify the issues in specific financial situations. There was no change in the prerequisite that borrowing be "necessary." By its own terms, the update did not expand the Secretary's interpretation concerning the use of funded depreciation. The update speaks to the timing of the distribution of funds from the funded depreciation account when the health-care provider has contractually committed those funds and the hospital will completely use those funds. Moreover, as the caveat in the second paragraph of the update states, those funds must be *totally consumed* within a short period of time during construction or acquisition of the capital asset.

The Court concludes that the Secretary consistently has interpreted the regulations to mean that borrowing is not "necessary" to the extent that there are funds available in the funded depreciation account. The Secretary has applied this interpretation since the inception of the Medicare program. Blue Cross, the fiscal intermediary, the PRR Board, and the Secretary all agree on the application of the law to this extent. The Court concludes that it is unavailing to claim that plaintiff's 1982 borrowing was "necessary" notwithstanding the funds in its funded depreciation account. The agency considered counsel's skillful argument three separate times in the decisions below. Each time, the agency rejected the argument. Even the PRR Board, whose interim decision plaintiff seeks to reinstate, did not rely on this ground when it reversed Blue Cross.

B.) Agency Adjudications Support the Secretary's Position

Several cases support the Secretary's argument that borrowing is not "necessary" within the meaning of the statute to the extent that the funded depreciation account has funds. Most of the cited cases are instances where the Secretary reverses the

PRR Board.[6] *See, e.g.,* PRRB Dec. 75–D3 (unnamed), Medicare and Medicaid Guide (CCH), ¶ 27,426 (June 25, 1975), Government's Ex. D; *Northwest Hospital, Inc. v. Hospital Services Corp.,* PRRB Dec. No. 76–D11, Medicare and Medicaid Guide (CCH), ¶ 27,972 (March 30, 1976), *aff'd,* 500 F.Supp. 1294 (N.D.Ill.1980), *aff'd,* 687 F.2d 985 (7th Cir.1982); PRRB Dec. No. 76–D16 (unnamed) (April 30, 1976), Government's Ex. F; *Bemidji Community Hospital v. Blue Cross Assoc. and Blue Shield of Minnesota,* Administrator's Decision, Medicare and Medicaid Guide (CCH), ¶ 29,704 (May 4, 1979), Government's Ex. M.

*Bemidji Community Hospital* is a particularly important decision for several reasons. First, in *Bemidji,* the Secretary reversed the PRR Board and held that the hospital's borrowing was not "necessary." The Secretary withheld reimbursement of interest expense to the extent that Bemidji Community Hospital had a surplus of funds in its funded depreciation account at the time of its unnecessary borrowing. As the deputy administrator stated:

"... Necessary requires that the interest [on capital borrowing]: (i) be incurred on a loan made to satisfy a financial *need* of the provider ..." (Emph.Supp. [in administrator's decision]) There is no room for allowing, under this definition, interest on loans made for the sake of convenience, appropriateness, or usefulness. On the contrary, there must be a financial need. No degrees of "need" are set forth in this Regulation. It is absolute in its requirement that, to be a cost recognized as allowable for Medicare reimbursement, there must exist financial need.

\*   \*   \*   \*   \*   \*

The loan failed to meet the basic criteria of the regulations. The provider did not have a financial *need* to make the loan. Borrowing could well have been a prudent business decision, by a consensus of the provider's Board of Trustees.

They may have wished to conserve funds for other useful projects, or for a variety of other sound reasons....

*Bemidji,* ¶ 29,704 at 10,212, Government's Ex. M. The Secretary drew a bright line because he concluded that any "prudent" borrower standard would lead to reimbursement of excessive costs as well as unnecessary costs and other abuses in the Medicare system.

The date of the *Bemidji* decision is also important in the context of several other agency adjudications. The three cases discussed below might be read as establishing a "prudent borrower" rule through agency adjudication. The deputy administrator issued the decision in *Bemidji* on May 4, 1979. The timing of *Bemidji,* i.e., between the three decisions discussed below, conclusively shows that the agency did *not* adopt a "prudent borrower" standard through adjudication.

*Bemidji* also contradicts plaintiff's putative *reliance* on a different rule. There was no "prudent borrower" standard. Even the Provider Reimbursement Review Board in its decision in favor of St. Bernards did not rely on a contrary rule.

The Court distinguishes three cases that do not seem to support the Secretary's position here. In *Research Medical Center v. Blue Cross and Blue Shield Association of Kansas City,* Administrator's Decision, Medicare and Medicaid Guide (CCH), ¶ 29,447 (Sept. 28, 1978), Government's Ex. I1, the HCF Administrator affirmed the PRR Board decision granting reimbursement for interest expense although the health care provider had funded depreciation available. The case is clearly distinguishable.

In *Research Medical Center,* the appropriate local agency issued a certificate of need approving the long-term, multi-phase Medical Center expansion plan including provisions to spend the funds in the funded depreciation account. As the Administrator stated in the decision affirming the

---

**6.** The PRR Board is composed of 5 people, 2 of whom must be representatives of providers of health care services. 42 U.S.C. sec. 1395oo (h). This may help explain why the PRR Board tends to give more favorable decisions to health care providers than either the financial intermediary or the Secretary.

PRR Board, "Definite planned utilization does not, in itself, justify the provider's incurrence of capital loans." *Id.* at 9272. The Secretary affirmed the decision, however, because Research Medical Center not only "self-restricted" its funds, it also committed itself to the appropriate local agency to disburse all of the borrowed funds as well as the funds in the funded depreciation account.

In the instant case, St. Bernard's obtained a "certificate of need" for $13.575 million from the Arkansas Health Planning and Development Agency. The Arkansas agency based the amount of the "certificate of need" on a projected $15 million cost minus the balance of funds in the funded depreciation account, i.e., some $1,425,000. However, St. Bernard's twice reduced the projected cost of its capital program. Ultimately, St. Bernard's issued bonds in the amount of $12.75 million, some $2.25 million less than the original estimate. At the same time, St. Bernard's funded depreciation account increased from $1.425 million to $1.791606 million. St. Bernard's therefore was significantly better off at the time of the borrowing than at the time the State of Arkansas issued the certificate of need. St. Bernards did not have a contractual commitment to the Arkansas Health Planning Development Agency to disburse its funded depreciation account funds once the total cost of the project dropped below the original estimate.

There were other, more important, distinguishing aspects as well. Research Medical Center also received low cost financing from HUD to finance the capital expenditure. The federal funding was at one-half the prevailing interest rate at the time of the original borrowing, and arguably should have and did receive more favorable accounting treatment for Medicare reimbursement purposes. *Cf.* 42 C.F.R. § 405.-418, Depreciation allowance for depreciation on assets financed with Federal or public funds. By contrast, St. Bernard's, by its own admission, borrowed on the open market at a high rate of interest.

Research Medical Center actually spent all the funds in its funded depreciation account, depleting the account entirely. In the instant case, St. Bernard's has not depleted the funds in its funded depreciation account. On the contrary, St. Bernard's has increased the amount of funds in its funded depreciation account every year since 1982.

In *Mercy Hospital v. Blue Cross Ass'n,* Administrator's Decision, Medicare and Medicaid Guide (CCH), ¶ 30,318 (November 5, 1979), Government's Ex. J, the hospital began a two-phase building program in 1964. In the 1976 cost report, the fiscal intermediary attempted to reduce the interest expense for loans made in 1967 and 1969 as part of the building project. The PRR Board reversed and the Administrator affirmed the reversal, which did not reduce allowable interest expense even though funded depreciation was available.

It is apparent in *Mercy Hospital* that there was some commitment, more than a board resolution, to expend the borrowed funds: The hospital beds did not conform to minimum regulatory requirements at the time of the initial building plan. The first phase of the building plan was "completed" when the hospital ran out of money; but the hospital intentionally installed a temporary roof that did not conform to health, fire, and safety regulations over the first four floors of the planned eight-floor expansion. Thus the hospital obligated itself as a matter of law to spend additional capital funds to complete the building. The only funds it had available to meet its legal obligations at the time were the funds in the funded depreciation account.

Moreover, in *Mercy Hospital,* at least some of the funds in the funded depreciation account balance were "contributions from the motherhouse." PRR Board Decision, Medicare and Medicaid Guide (CCH), ¶ 30130 at 9881 (December 31, 1976). Thus, assuming the applicable regulation did not change between 1976 and 1982, the regulations excepted contributions from the interest offset provision. 42 C.F.R. § 405.419(b)(2)(iii). The funds arguably should have been in segregated accounts

(*id.*) and arguably received more favorable accounting treatment by the HCF Administrator. *Id.; cf.* 42 C.F.R. § 405.423, Grants, gifts, and income from endowments.

Finally, Mercy Hospital spent its entire funded depreciation account balance in order to complete the expansion. The hospital used all of its funded depreciation account balance and did not receive the double benefit of interest expense reimbursement while it was sheltering interest income in the funded depreciation account. While the HCF Administrator perceived a benefit to Medicare from the earlier, lower interest financing, the HCF Administrator also noted that Mercy Hospital used the funded depreciation account funds in their entirety.

In *St. Francis Community Hospital v. Schweiker*, Medicare and Medicaid Guide (CCH), ¶ 34,156 (D.S.C. March 10, 1983), the district court examined what seems to be a nearly identical issue to the issue at bar. In the 1978 cost report, the fiscal intermediary denied St. Francis reimbursement for interest expense on funds borrowed in 1974, claiming certain borrowing was not "necessary" under the regulations. The PRR Board reversed the fiscal intermediary. The HCF Administrator reversed the PRR Board and reinstated the decision of the fiscal intermediary denying reimbursement for interest expense on the 1974 borrowing. The district court reversed, finding the HCF Administrator's decision unsupported by substantial evidence. The case is clearly distinguishable from the case *sub judice.*

St. Francis Community Hospital contractually committed its funded depreciation account funds. The HCF Deputy Administrator apparently overlooked an important part of the financial history of St. Francis Community Hospital. St. Francis began a building program in 1971. Subsequently, the hospital ran into substantial financial difficulty. St. Francis entered into an agreement with the Department of Health, Education, and Welfare (HEW), the predecessor to the Department of Health and Human Services.

The agreement between HEW and St. Francis provided financing to St. Francis under the Hill–Burton program: HEW agreed to guarantee payment of St. Francis' capital loans and to subsidize the hospital's interest payments by paying 3% interest to the lender, thereby reducing the effective interest rate to the hospital. In exchange, St. Francis agreed with HEW to provide a certain amount of uncompensated care to indigent patients. The accounting treatment for Hill–Burton funds is more favorable than the accounting treatment for funds borrowed from private sources. *Cf.,* 42 C.F.R. § 405.418, Depreciation: Allowance for depreciation on assets financed with Federal or public funds. *St. Francis Community Hospital* is therefore more like *Research Medical Center,* which the Court has already distinguished, than it is like the case at bar.

St. Francis also contractually agreed to maintain a minimum balance, with higher minimum balances as time progressed, in a funded depreciation account. St. Francis contractually agreed only to use those funds to make principal payments and to pay for capital acquisitions.

Finally, the district court in *St. Francis Community Hospital* found that the funded depreciation account did not have excess funds in 1978. The balance of the account was *below* the minimum balance St. Francis' agreement with HEW required it to maintain. Thus St. Francis effectively expended more than all of its uncommitted funded depreciation account balance prior to the 1978 cost report prepared by the fiscal intermediary.

The Court concludes that the three cases cited by plaintiff are distinguishable. In the instant case, St. Bernard's has never depleted its funded depreciation account. Since the borrowing in 1982, the balance has significantly increased. Unlike each of the three cases cited by plaintiff, there is no contractual committment of funds to the Secretary or to an appropriate state agency. St. Bernard's did not borrow at a reduced rate of interest. The borrowing here is of no benefit to the Medicare Program.

## 588

C.) Transmittal No. 279 Did Not Change the Agency Interpretation

The Secretary issued a "clarification" of the regulations at issue in January 1983. The "clarification" purports to be retroactive to November, 1982, i.e., prior to the time of the borrowing here. The clarification supports the Secretary's position. If the clarification issued by the Secretary in January 1983 is a substantive change in the regulation, it would not apply to this case. *Cf. Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (retroactive rulemaking by administrative agencies is impermissible). The Court concludes that the 1983 "clarification" was not a substantive change to the rule, but merely a statement of prevailing policy. The Court applies the Secretary's prevailing policy from 1982 in its decision of the case.

The Court concludes that Transmittal No. 279 did not change the Secretary's interpretation requiring use of funded depreciation before borrowing would be considered necessary. The transmittal notified health care providers that the agency had revised the Provider Reimbursement Manual to reflect clarifications and new policies. In the description of the "clarification" section, the transmittal described the change in § 226 concerning funded depreciation: "This section has been expanded to define suitable types of investments for funded depreciation to assure its availability for asset acquisition. It has also been restructured for clarity." Government's Ex. C, R. at 597.

The text of the "revised" Provider Reimbursement Review Manual § 226 states, in relevant part:

C. **Restrictions.**—Funded depreciation (total market value of fund) must be available (unless contractually committed as noted below) on an as needed basis for the acquisition of the provider's depreciable assets used to render patient care, or for other capital purposes related to patient care. Loans made from funded depreciation do not alter the requirement that funded depreciation must be available.

Funds are considered available unless committed, by virtue of contractual arrangements, to the acquisition of depreciable assets used to render patient care, or to other capital purposes. Borrowing for a purpose intended by funded depreciation is unnecessary to the extent funded depreciation is available. Thus, interest expense *for borrowing up to the* amount of available funded depreciation is not an allowable cost.

Government Ex. B, R. at 593–94.

The 1983 revisions to § 226 reiterated the agency's policy that it would only consider a loan "necessary" to the extent that funded depreciation was not "available." The revision also explicitly stated that interest expense would NOT be an allowable cost when funded depreciation was available. As the Court concluded above, these were the agency's longstanding policies. The 1983 revision clarified but did not change the prior agency interpretation.

Any change in the Secretary's interpretation of certain other sections of the regulations is not relevant to the question before the Court. The Secretary did add language permitting health-care providers to "contractually commit" funded depreciation. The agency would not consider "contractually committed" funds to be "available" funds. This modification of the agency's interpretation was a benefit to health-care providers. The modification relaxed the Secretary's "funds must be expended" policy. The Court does not interpret this agency largess as a basis to conclude that the regulations entitle St. Bernard's to reimbursement for interest expense on the 1982 bond issue to the extent requested here. There was no change—substantive or otherwise—in the Secretary's interpretation of the determination of the necessity of borrowing.

The transmittal had a separate section titled "New Policy," with an effective date for "cost reporting periods beginning on or after December 1, 1982." The description of § 226.4 concerning withdrawals from the funded depreciation account stated:

This section is revised to provide new policy for the application of the interest

income offset where withdrawals from the funded depreciation account are for purposes other than its intended purpose. Under the revised policy, the interest income earned on funds withdrawn for other than the intended purpose shall be offset against interest expense incurred during all cost reporting periods subject to reopening. Prior policy limited the offset to interest expense incurred during the period of withdrawal. Clarification has also been provided for the priority of withdrawal of available funded depreciation in conjunction with the use of borrowed funds.

Government's Ex. C, R. at 597.

The text of the "new policy," Provider Reimbursement Review Manual § 226.4, states in relevant part:

*Withdrawals from the Funded Depreciation Account.*—Because deposits in the funded depreciation account may be used for a variety of purposes, the following provisions apply:

A. *Withdrawals for the Acquisition of Depreciable Assets Used to Render Patient Care or Other Patient Care–Related Capital Purposes and For Investments.*—These withdrawals must be made on a first-in, first-out basis. The oldest deposits must be withdrawn first. These withdrawals must be related to the acquisition of such assets of the same provider maintaining the fund from which such withdrawals are made. The program does not recognize the use of one provider's funded account to acquire patient care assets of another provider because a funded depreciation account is limited to the use of the provider maintaining it.

B. *Withdrawals for Other Than the Acquisition of Depreciable Assets Used to Render Patient Care or for Other Patient Care–Related Capital Purposes and Investments.*—These withdrawals must be made on a last-in, first-out basis. The latest deposit made must be considered the deposit withdrawn for these purposes. For example, if a loan is made to the general fund on February 1, 1980, and deposit of an equal or greater amount is in the funded account since January 1, 1980, the withdrawal will be considered to be made from the January 1 deposit and interest, if any, paid by the general fund is not allowable as a cost, because the funds were not on deposit for at least 6 months. (See § 226.3.)

When funded depreciation is used by the provider for other than (1) the acquisition of depreciable assets used to render patient care; (2) investments; (3) loans to the general fund for current operating costs related to patient care; or (4) other capital purposes as described in § 226, the investment income earned on these funds while on deposit in the funded account shall be used to reduce allowable interest expense incurred during all cost reporting periods subject to reopening.

C. *Priority of Withdrawals.*—Available funded depreciation must be withdrawn and used before resorting to borrowing for the acquisition of depreciable assets or other capital purposes, except that, when available funded depreciation is insufficient to cover the total cost of a major construction project and borrowing is necessary (see § 202.2), all available funded depreciation need not be withdrawn and applied to construction cost prior to borrowing. Because it is frequently difficult to time a bond offering or other borrowing to coincide with the exhaustion of available funded depreciation, it is sufficient if available funded depreciation is contractually committed to and expended during the course of construction.

PRMB § 226.4 (January, 1983).

The Court concludes that the "new policy" implemented in § 226.4(c) did no more than reiterate the policy permitting health-care providers to "contractually commit" their funded depreciation accounts. This benefit to health-care providers does not give St. Bernard's any additional ground to challenge the agency's longstanding policy concerning the necessity of borrowing determination.

**D.) Transmittal No. 279 is an Agency Interpretive Rule**

Assuming that prior law does not govern this case, the Court concludes that the January 1983 Transmittal No. 279 from the HCF Administration to St. Bernard's is an interpretive rule that applies to this case. The transmittal as described above did no more than announce changes to the language in the Provider Reimbursement Review Manual. The Eighth Circuit has long held that: "[a] provision in the Provider Reimbursement Manual is an agency interpretive rule, not subject to the rulemaking procedures of the Administrative Procedure Act." *Columbus Community Hospital, Inc. v. Califano*, 614 F.2d 181, 187 (8th Cir.1980); *Creighton Omaha Reg. Health Care Corp. v. Bowen*, 822 F.2d 785, 791 (8th Cir.1987).

The Secretary's transmittal did not violate the "notice and comment" procedure, although there was no 30–day notice and opportunity to comment. The Provider Reimbursement Manual is a set of agency interpretive rules. The "notice and comment" provisions of the Administrative Procedure Act do not apply to interpretive rules. 5 U.S.C. § 553(b)(A).

The Court also concludes that the Secretary's interpretation was neither erroneous nor inconsistent with the regulations. The Court "must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... The ultimate criterion is the administrative interpretation, which becomes of controlling weight *unless it is plainly erroneous or inconsistent with the regulation.*" *Columbus Community Hospital*, 614 F.2d at 187. In the instant case, the applicable "revisions" to the Provider Reimbursement Manual merely clarified existing agency policy. The only significant *change* in the manual was the explicit provision permitting health-care providers to "contractually commit" funds in their funded depreciation accounts. This change in the agency's interpretation was a *benefit* to the health-care providers, not a detriment. The Court concludes that the Secretary's interpretation of the regulation,

as embodied in Transmittal No. 279, would be entitled to controlling weight.

Assuming the Secretary's interpretation is a new *substantive* rule, the Court concludes that it would NOT be invalid on that ground. The legislative history of the Administrative Procedure Act:

... states that "[t]he phrase 'future effect' does not preclude agencies from considering and, so far as legally authorized, dealing with past transactions in prescribing rules for the future." [H.R.Rep. No. 1980, 79th Cong. 2d Sess., 49, n. 1 (1946), U.S.Code Cong.Serv.1946, p. 1195]. The Treasury Department might prescribe, for example, that for purposes of assessing future income tax liability, income from certain trusts that has previously been considered nontaxable will be taxable—whether those trusts were established before or after the effective date of the regulation. That is not retroactivity in the sense at issue here, *i.e.*, in the sense of altering the *past* legal consequences of past actions. Rather, it is what has been characterized as "secondary" retroactivity, see McNulty, Corporations and the Intertemporal Conflict of Laws, 55 Cal.L.Rev. 12, 58–60 (1967). A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desireable in the future), but it does not for that reason cease to be a rule under the APA. Thus, with respect to the present matter, there is no question that the Secretary could have applied her new wage-index formulas to respondents in the future, even though respondents may have been operating under long-term labor and supply contracts negotiated in reliance upon the pre-existing rule. But when the Secretary prescribed such a formula for costs reimbursable while the prior rule was in effect, she changed the *law* retroactively, a function not performable by rule under the APA.

A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past invest-

ment incurred in reliance upon the prior rule—may for that reason be "arbitrary and capricious" see 5 U.S.C. § 706, and thus invalid.

*Bowen v. Georgetown University Hospital,* 109 S.Ct. at 477 (Scalia, J., concurring). The "change" is not the type of impermissible retroactive application that the *Georgetown University Hospital* Court overturned. The Secretary's application here has nothing more than "secondary retroactive effect" as Justice Scalia described it. If Transmittal No. 279 represents a substantive change in the law, the Secretary's application thereof is not unreasonable in light of the extensive history of applying the same principles outlined by the Court, *supra.* Therefore the Court concludes that the Secretary's application of transmittal no. 279 would not be "arbitrary and capricious." [7]

E.) Spend–Down Theory is Unavailing When Funds Are Suspended

The Court concludes that plaintiff cannot claim to have "spent down" the funds that were available in the funded depreciation account prior to the unnecessary borrowing. When a health-care provider borrows money for capital expenditures while there are available funds in the funded depreciation account, those funds immediately become "suspended funds." Blue Cross Bulletin No. 1186, R. at 480. Once the funds are "suspended," the "first-in, first-out" account principle no longer applies to the balance in the funded depreciation account until the health-care provider spends any addition to the funded depreciation account *and* the suspended funds themselves.

Blue Cross Bulletin No. 1186, issued in September, 1977, covers precisely this point. The Court sets out the relevant provisions and examples in full because they are critical to this case. The Bulletin states:

When a provider has a funded depreciation account and borrows money for a

capital expenditure without expending the funded depreciation, the deposits in the funded depreciation account up to the amount of the borrowing, [sic] undergo a change in character. In this paper, we will consider such deposits as suspended from the funded depreciation account for Medicare purposes.

Thus, the equivalent amount of borrowing becomes unnecessary, and the amount of funded depreciation becomes suspended. The effect achieved is equivalent to the proper expenditure of funded depreciation and a necessary borrowing. Because of this change in character, the Medicare rules which apply to funded depreciation would not be applied to the suspended funded depreciation. As the interest on the unnecessary loan is disallowed, there is no requirement to offset the interest income on the suspended funded depreciation. This treatment permits the provider to make management decisions which are different from those recognized for Medicare reimbursement purposes, while still protecting the Medicare program.

Therefore, the suspended depreciation fund would no longer be considered as funds available for capital expenditures, until all additional deposits in funded depreciation and other available funds ... have been utilized.

HIM–15–I, [The Provider Reimbursement Manual,] Section 226.4 states:

"Funded depreciation or other deposits in the funded depreciation account may be used by the provider for purposes other than the improvement, replacement, or expansion of facilities or equipment related to patient care. In such cases, allowable interest expense in the period of withdrawal is reduced to adjust for offsets not made in prior years for earnings applicable to such funds ..." [sic]

However, this part of Section 226.4 would only be applicable when the sus-

7. The Court notes its explicit disagreement with the District of Delaware on this point. *St. Francis Hospital v. Sullivan,* No. 89–291–JJF, slip op. at 3–4, 1990 WL 284514 (D.Del. March 1, 1991). The Court agrees with the District of the District of Columbia on this point. *Sentara Hampton General Hospital v. Sullivan,* No. 89–1248, 1991 WL 191241, 1991 U.S.Dist. Lexis 7096 (May 24, 1991).

# 592

pended funded depreciation was eventually expended, and then only when the purpose is other than the improvement, replacement, or expansion of facilities or equipment related to patient care. Prior to the suspended funds being actually expended, they would still be available for the legitimate purposes of funded depreciation once no other funds were available.

When the suspended funded depreciation is used for other than a legitimate purpose, the offsets required by Section 226.4 would be made only for periods prior to the funds becoming suspended. While the funds were suspended, no interest income offset would be appropriate, as the interest expense on the equivalent unnecessary loan is not allowable. Any offset would be made in the period in which the funds were actually expended. The application of this change in character rule will be exemplified in the resolution of problems which follows in D. below.

Blue Cross Administrative Bulletin # 1186, R. at 480–81. The bulletin used several examples to illustrate the principle. The Court sets out the relevant example in the margin.[8]

The Secretary's policy is to prevent any "double benefit" from accruing to healthcare providers who borrow money unnecessarily while there are available funds in the funded depreciation account. The policy requires something more than "spending down." The reason to require spending all "suspended" funds is to prevent healthcare providers from funding their funded depreciation accounts, borrowing an equiv-

---

**8.**

Year 1 – $3,000,000 loan, $1,000,000 funded depreciation
– Asset related to patient care purchased for $3,000,000
– Interest expense on $1,000,000 of loan disallowed

Year 2 – No capital expenditures.
– $300,000 loan principal repaid on first of year.
– $200,000 added to funded depreciation on first of year.
– Interest expense on $1,000,000 disallowed.
– Loan outstanding at end of year $3,000,000 − $300,000 = $2,700,000
– Suspended funded depreciation—$1,000,000

Year 3 – $200,000 added to funded depreciation on first of year.
– $300,000 loan principal repaid on first of year.
– $350,000 asset purchased out of funded depreciation on last day of year.
– Interest expense on $1,000,000 disallowed (outstanding loan principal of $3,000,000 less repayments of $600,000 to date = $2,400,000).
– Funded depreciation balance of $50,000 ($200,000 + $200,000 − $350,000).
– Suspended funded depreciation of $1,000,000 (not considered part of funded depreciation).

This illustrates that any additions to funded depreciation must be used before any of the suspended funded depreciation becomes eligible.

Year 4 – $200,000 added to funded depreciation on first of year.
– $300,000 loan principal repaid on first of year.
– $500,000 asset purchased using funded depreciation on first day of seventh month.
– This leaves no funded depreciation ($50,000 + $200,000 = $250,000 − $500,000 = $250,000), expended for assets, therefore zero funded depreciation.
– Interest expense on $1,000,000 disallowed for the first six months and on $750,000 for the second six months.
– Outstanding loan principal of $210,000 ($3,000,000 less three payments of $300,000 each).

This illustrates that the suspended funded depreciation is utilized only after all additions to funded depreciation have been expended. The amount of the loan disallowance will always be the lesser of the amount of suspended funded depreciation or the remaining outstanding loan principal.

Bulletin 1186, Example No. 5 "Provider Funds Additional Depreciation and Subsequently Spends Funded Depreciation on A Capital Expenditure Related to Patient Care;" R. at 485–86.

alent sum where Medicare reimburses the interest cost while the hospital shields interest income in the funded depreciation account from the normal interest offset rule. The policy prevents health-care providers from using Medicare as an independent source of income. The policy also prevents "wealthy" hospitals with funded depreciation accounts from using Medicare funds as a source of strategic financing that would not be available to "poor" hospitals that are unable to maintain a surplus balance of funds in their funded depreciation accounts.

The Court notes that the Secretary's policy does *not* require St. Bernard's—or any hospital—completely to deplete a funded depreciation account. The regulations provide that funds must remain in a segregated account for six months before they become "funded depreciation account" funds eligible for interest offset. So it is possible for a hospital to have funds in the account, earning interest, while the hospital depletes the suspended funds using a "last-in, first-out" principle. The penalty would be delaying the interest offset provision on the last deposited funds for a period of six months.

The Court concludes that St. Bernard's did not "cure" their unnecessary borrowing by "spending down" the funded depreciation account. St. Bernard's significantly increased the balance in its funded depreciation account in the interim. It has never spent the "suspended funds" that must be accounted for on a "last-in, first-out" basis.

F.) Extent of Contractual Commitment Requires Remand

The Court concludes that the Secretary has not shown that St. Bernard's did not contractually commit funds in the funded depreciation account at the time of the unnecessary borrowing. The record reflects $253,870.59 in outstanding purchase orders in 1982. St. Bernard's claims these are purchase orders for major moveable equipment and are therefore contractual commitments for capital expenditures within the Medicare regulations. The Secretary, in his brief to the Court, contends that the purchase orders do not constitute contractual commitments for capital expenditures within the Medicare regulations.

The Court concludes that the record is incomplete in this area and must be remanded to the Secretary for reconsideration. On the one hand, plaintiff's Vice President of Financing, Mr. R.B. McClung, testified repeatedly in the hearings below that there were no contractual commitments for capital expenditures in 1982. R. at 153–154; R at 198. Yet in the hearing before the Secretary, St. Bernard's produced 39 exhibits representing purchase orders that it claims were capital expenditures. The Secretary noted as much in the decision below, but declined to credit St. Bernard's with having had any contractual commitments at the time of the borrowing.

The Court will remand the issue to the Secretary with directions to determine whether the exhibits in the record represent contractual commitments for capital expenditures within the meaning of the Medicare regulations at the time of the unnecessary borrowing. The Court finds several areas of the record that require attention in this regard: For example, St. Bernard's issued the bonds in question on December 6, 1982; the funds in the funded depreciation account were "suspended" at that point. However, the record shows a purchase order from Mid South Oxygen for $10,101.68 dated December 10, 1982.

The record also reflects purchase orders for, *inter alia*, a golf cart for $900.00; a 72″ large-screen Sony television for $3,100; a "5–pak" of film for $899.00; and "duplicate cassettes" for $36.00. The Court directs the Secretary to audit these items. The Secretary should determine whether St. Bernard's claims are capital expenditures that fall within the meaning of the relevant Medicare regulations or whether they are expenses or other operating costs that are not "capital expenditures" under the applicable regulations. The Court concludes that St. Bernard's will be entitled to reimbursement for interest expense on those items that the Secretary determines are legitimate capital expenditures that St.

Bernard's contractually committed to spend at the time of the unnecessary borrowing.

## V.) SECRETARY'S NOTICE AND COMMENT PROCEDURE— JUNE, 1991

The Secretary on June 3, 1991 published in the Federal Register a proposed "revision" in the applicable regulations and administrative interpretations. 56 Fed.Reg. 25201–25202, 25208–25209 (to be codified at 42 C.F.R. § 413.134, and 42 C.F.R. § 413.-153) (proposed June 3, 1991). After the adverse decision in *St. Francis Hospital v. Sullivan,* No. 89–291–JJF, 1990 WL 284514 (D.Del. March 1, 1991), the Secretary determined that he had to remove any doubt concerning the matters discussed in this Court's opinion.

While the new regulations do not apply to the case at bar, the Court discusses the proposed regulations because the Secretary proposes to codify the principles set out by the Court, above, as the governing administrative interpretations.

The regulations do not persuade the Court that the Secretary incorrectly implemented the 1983 interpretation. Nor do the regulations, themselves, persuade the Court that the Secretary's interpretation was correct. However, it is clear that the regulations do embody the Secretary's longstanding interpretation. The Secretary explicitly proposes to adopt a standard that funds in the funded depreciation account must be contractually committed or actually expended before the Secretary will consider borrowing to be considered "necessary" for capital expenditures.

The Secretary also explicitly proposes to adopt regulations detailing the proper order for withdrawing funds from funded depreciation subsequent to a determination of unnecessary borrowing. As the Secretary states:

> We are also proposing to clarify our policy that withdrawals from funded depreciation that do not meet the requirements for proper withdrawals are considered improper withdrawals. Improper withdrawals would be deemed made on a last-in, first-out basis.

56 Fed.Reg. at 25202. That is, the Secretary explicitly rejects the "spend-down" principle when there are funds in the funded depreciation account and borrowing is not necessary within the meaning of the regulations.

## VI.) CONCLUSION

The Court agrees with the Secretary's interpretation of the relevant regulations as discussed above. Based on the evidence before the Court, and the record as a whole, the Court concludes that the Secretary's determination that borrowing was not "necessary" to the extent that funded depreciation was "available" for the 1984 cost year was not arbitrary, capricious, or otherwise an abuse of discretion. The Secretary did not make this determination in violation of his statutory authority. The evidence of record substantially supports the Secretary's determination in this regard.

The Court also concludes, as discussed above, that there is not enough evidence in the record to support the Secretary's denial of interest reimbursement for funds that may have been "contractually committed" at the time of the unnecessary borrowing. The Court will remand the case to the Secretary for proceedings not inconsistent with the Court's opinion as to St. Bernard's 1982 purchase orders.

IT IS THEREFORE ORDERED that the plaintiff's motion for summary judgment, docket no. 9, be, and it is hereby, GRANTED IN PART AND DENIED IN PART in accordance with the terms of this Order.

IT IS FURTHER ORDERED that the defendant's motion for summary judgment, docket no. 13, be, and it is hereby, GRANTED IN PART AND DENIED IN PART in accordance with the terms of this Order.

IT IS FURTHER ORDERED that the case be, and it is hereby, REMANDED TO THE SECRETARY with directions to audit the 1982 purchase orders and for any other necessary proceedings not inconsistent with the Court's opinion.